VAN DE BOGART, by guardian *ad litem,* Respondent, vs. MAR-
INETTE & MENOMINEE PAPER COMPANY, Appellant.

*May 3—June 20, 1907.*

*Trial: Special verdict: Instructions informing jury as to effect of an-
swers: Master and servant: Injuries to minor servant: Un-
guarded set-screw on shafting: Evidence: Questions for jury:
Negligence: Contributory negligence: Excessive damages.*

1. Instructions to the jury in this case as to the questions submitted
   for special verdict are *held* not to have been erroneous on the
   ground that they informed the jury as to the legal effect of
   their answers.
2. In an action for injuries to a young girl caused by her hair being
   caught by a projecting set-screw on a revolving shaft in a pa-
   per mill in which she was employed, the question whether the
   set-screw was so located on the shaft as to be dangerous to em-
   ployees while in the discharge of their duties so that, under
   sec. 1636*j*, Stats. (1898), it was the duty of the owner or man-
   ager of the mill to guard such set-screw and the failure to do
   so was negligence, was a question of fact for the jury.
3. The set-screw, used in attaching a circular knife to the shaft, was
   a part of the "shafting" within the meaning of sec. 1636*j*, Stats.
   (1898).
4. In such action it was not error to permit the jury to consider in
   connection with the other evidence, as bearing upon the ques-
   tion of defendant's negligence, the fact that some time prior to
   the injury a bar or girth located about nine inches below the
   shaft at the place where plaintiff was injured had been taken
   out, and the purpose of placing it there and the reasons for
   taking it out.
5. In submitting to the jury the question whether a man of ordi-
   nary intelligence and prudence, circumstanced as defendant's
   officers in charge of the mill were at the time of the accident,
   ought reasonably to have foreseen that the presence of the set-
   screw as it was might probably cause injury to an employee
   working about the machine, there was no error prejudicial to
   defendant in instructing the jury that it is the duty of an em-
   ployer to provide a safe place for his employees to work, and
   that in doing this he is only required to exercise ordinary care
   and prudence.
6. It was not an abuse of discretion as to defendant for the trial
   court, while charging the jury as to the questions submitted for

special verdict, to amend the above question so as to require the jury to answer it only in case they found, in answer to a previous question, that defendant was negligent in permitting the set-screw to be and remain on the machine as it was.

7. The questions of plaintiff's assumption of risk and contributory negligence are *held*, upon the evidence, to have been questions for the jury.

8. Instructions upon the question of contributory negligence to the effect that by "ordinary care" on the part of plaintiff was meant such care as the great mass of girls of her age ordinarily exercise under the same or similar circumstances, and that plaintiff, being a minor, would not be held to the same degree of care as an adult, were not erroneous.

9. For a very severe injury to the head of a young girl, involving fracture of the skull, portions of which were driven into the brain, and producing an epileptic condition which would probably grow worse until insanity or death should result, an award of $14,000 as damages is *held* not excessive.

APPEAL from a judgment of the circuit court for Marinette county: B. F. DUNWIDDIE, Judge. *Affirmed.*

This is an action to recover damages for personal injuries sustained by the plaintiff August 24, 1903, when she was fifteen years of age and while in the employ of the defendant, where she had been at work in its paper machine room No. 1 as cutter girl about four weeks. The circumstances under which she was injured are stated in the brief of counsel for the defendant to the effect that the machine upon which she was employed and upon which she was injured was provided with numerous rolls for conveying the paper and with slitters or knives for cutting the paper in desired widths. The slitters were circular knives and were attached to shafts, known as slitter shafts, by means of collars and set-screws. Any number of slitters, usually from seven to nine, could be attached to the shaft and in any desired position on the shaft, the relative position of the slitters depending upon the desired width of the paper to be cut, and the position of the slitters was frequently changed by loosening the set-screw with a monkey wrench and sliding the slitters along the

shaft to the point desired. The slitter in question was second to the one nearest to the west end of the revolving slitter shaft, and was fastened with a square-headed set-screw, which projected from three quarters of an inch to an inch and one-quarter. The machine in question had two functions—one to make paper in sheets, and the other to make paper in rolls. When on sheets it was the plaintiff's duty to lay off the sheets of paper as they came from the machine. When on rolls, making the paper in a continuous roll, the plaintiff's duty was to watch the shavings made by the end slitter—that is, the slitter nearest the edge of the paper—to see that the shavings did not wind around the knives and shaft and clog the machine. If shavings were not falling down properly it was the plaintiff's duty to go under the top rolls and beneath the paper then being trimmed, and reach up and pull the shavings down with her hands. At the point where she went underneath, the slitter shaft referred to in the complaint was about four and one-half feet above the floor. When running on sheets this slitter shaft revolved about 400 times a minute.

According to the plaintiff and her witnesses, on the morning of August 24, 1903, she had been once under the machine to pull down the shavings, had come out again, and was talking with other girls, when her attention was again attracted to the fact the shavings were not running right. She went beneath the machine again, stood in a stooping position looking up at the shavings, and reaching up for them with her hands. At that moment the rapidly revolving set-screw on the slitter in question caught her hair, which was dressed high on her head in pompadour fashion, and drew her head against the shaft with great force, inflicting severe injuries. One witness says:

"I was there when she was injured. I saw her pulling down the shavings. I saw the shavings roll over. I saw her go up and drop. She was almost in under the slitter shaft."

The plaintiff knew little about machinery. After she commenced to work, about three weeks of the time had been spent on sheets and about one week on rolls. She did not at that time know what a set-screw was; but she had been warned not to get her fingers caught by the knives, but had not been told anything about set-screws. There is considerable testimony in the record relative to a so-called guard which had formerly been on this machine and which had been removed. It served merely as a brace or girth for the purpose of sustaining the sides of the machine and the machine itself from vibration—a mere support for the machine itself to keep it in position and prevent vibration. There was another machine which did heavier work in which the bar mentioned had been left, but the machine on which the plaintiff worked made lighter paper, and this girth had been removed from the machine years before the accident.

The nature of the injury sustained, as stated by the attending physician, was a lacerated wound on the left side of the head, about an inch or an inch and a half in diameter, a fracture of the skull, portions of the skull being driven down into the brain, and the membranes were ruptured where it was driven through. There was a ragged, contused wound in the scalp, but whether it was torn in any place the witness could not say. The doctor trephined and lifted the fractured bone and removed it. There was extensive hemorrhage at the time which was controlled and dressed antiseptically. She was in the hospital six or seven weeks. The operation was one usually performed for that injury. The wound was healed all right; got nice results so far as the healing of the wound was concerned, but the bone will never form. Nature has filled up the space with scar tissue.

Previous to the injury the plaintiff was in good health and mentally normal. Since the injury she has suffered intense pains in the head almost continuously, and seems to go almost mad with the pain. She becomes terribly nervous and even

violent, suffers greatly in the night, and is a constant care to her mother, and at times she is in what is called the third stage of epilepsy, which developed and was due to the injury to the head, and will probably continue growing worse until insanity or death results.

There is evidence tending to prove that the set-screw might have been countersunk without impairing the efficiency of the machine, and also to the contrary. There is also evidence tending to prove that the slitter shaft, with an unguarded set-screw that projected one and one-fourth inches, revolved so fast that the set-screw could not be seen, and only four and one-half feet from the floor and directly over the plaintiff's head where she had to do her work. At the time she was injured Paul Seivert, who assigned her work to her and told her how to do it, was looking right at her, and he admitted that she was then in the discharge of her duty, doing her work, when reaching up with her hand to pull the shavings down; that on that morning she wore her hair tight to her head and in pompadour fashion. She was warned when reaching up for the shavings to be careful not to get her fingers caught in the knives, but had never been told of the projecting set-screw. She knew nothing of set-screws' or any danger that might arise from them on a rapidly revolving shaft. She was doing her work pulling down the shavings and watching the slitter knives on the west end slitter, and in this situation, when under the shaft and set-screw, she was seen to be lifted and dropped to the floor. She was injured by the set-screw on the second slitter from the west end. The machine was then on rolls, and the shaft and set-screw were in rapid motion. The shavings were running into the paper and hard to control. The machine at the time of the injury was in the same condition that it had been since the taking out of the girth or bar, and during the entire time for three years prior to the injury the same kind of set-screws were in use.

From one to five years before the injury those employed

had worked under the machine in question, pulling the shavings away, and during that time it was the custom to use for that purpose a cutter stick—a plain stick about one and one-half feet long, and used principally to straighten out the piles of paper when they were working on sheets—but there was no testimony of any custom to use the cutter stick at the time the plaintiff was injured, nor that it was the custom, even when those employed were at work under this machine, to use the cutter stick when the shavings went into the paper. The bar or girth, which was taken out of the machine some years before the time of the injury, extended through the machine, and was from eight to nine inches in a direct line below the slitter shaft. There is not much power required to hold a slitter on that shaft for that work. The thickness of one eighth to one fourth of an inch of iron of that kind would hold it. The machine in question was a type not in common use in 1903. In the machines in common use at that time the slitter shaft was one and one-half feet higher from the floor than in this machine.

Issue being joined and trial had, the jury at the close thereof returned a special verdict to the effect (1) that the plaintiff's hair did catch on the set-screw used to fasten the second slitter from the west end of the machine to the shaft, thereby causing the injury complained of; (2) that the place where the plaintiff was working at the time of her injury was rendered not reasonably safe by reason of the presence and condition of said set-screw; (3) that the defendant was negligent in permitting said set-screw to be and remain on said machine as it was; (4) that a man of ordinary intelligence and prudence, circumstanced as the defendant company's officers having charge of said mill were, at the time in question, reasonably ought to have foreseen that the presence of said set-screw, as it was, might probably cause personal injury to an employee working about the machine; (5) that the plaintiff was not guilty of contributory negligence; (6) that

a person of the plaintiff's age, intelligence, discretion, experience, and judgment ought not, by the exercise of ordinary care, to have discovered and understood the dangers to which she was exposed while doing the work about said machine; (7) that they assessed the plaintiff's compensatory damages at $14,000.

From the judgment entered upon such verdict in favor of the plaintiff for the amount stated the defendant appeals.

For the appellant there was a brief by *Vilas, Vilas & Freeman,* and oral argument by *W. F. Vilas.*

For the respondent there was a brief by *I. B. Kirkland,* attorney, and *Eastman & Martineau,* of counsel, and oral argument by *Mr. Kirkland* and *Mr. P. A. Martineau.*

CASSODAY, C. J.    This case was here upon a former appeal. 127 Wis. 104–113, 106 N. W. 805.    The special verdict considered on that appeal was substantially the same as on this appeal, except that the damages were less.    Pages 107, 108. On that appeal the judgment was reversed on the sole ground that the instructions to the jury were general on questions of ultimate fact, and "plainly informed them of the legal effect of their findings on negligence, contributory negligence, and assumption of risk."    Pages 110, 111.    It is claimed that in charging the jury on the last trial the court fell into the same error that was thus held to be fatal on the first appeal.    The records in that respect are quite different.    Mr. Justice SIEBECKER, in writing the opinion of the court on that appeal, said:

"Before giving instructions on the special verdict on different aspects of the case, the court charged the jury generally concerning the nature and theory of plaintiff's case, and the classes of facts they would need to consider in negligence cases."    Page 111.

This may be verified by reference to pages 80 to 83 of the printed case on that appeal.    Vol. 809, Cases and Briefs.

Such general discussion in the charge of the court on that appeal called attention to the difference in a simple question of fact and a mixed question of law and fact, like negligence, and told the jury that it would be necessary to have such general instructions in mind in answering some of the questions to be submitted by the special verdict, and which perhaps might be referred to again in reference to each particular question. Such general discussion in the charge of the court on such former appeal covered the question of "pure accident," partially quoted by my Brother SIEBECKER in the opinion mentioned, also the rule requiring a master to provide a reasonably safe place for his servant to work, and also another general rule as to the rights of the employer, and also the assumption of risk. Such general instructions, covering three printed pages, preceded the more specific instructions upon particular questions, some of which were subject to criticism. We have no general instructions preceding specific instructions upon particular questions in the case at bar. On the contrary, and in the language of the trial court, the questions submitted "are so framed as to require but little in the way of instruction." Any errors assigned in charging the jury on the specific questions submitted will be considered in their order.

2. No exception was taken to the charge of the court under the first question of the special verdict, so it must be regarded as a verity in the case that the plaintiff was injured by her hair being caught on the set-screw used to fasten the second slitter from the west end of the machine to the shaft.

3. Exception is taken to a portion of the charge under the second question submitted to the jury to the effect that, in determining whether the place where the plaintiff was working at the time of her injury was "rendered not reasonably safe by reason of the presence and condition of said set-screw," the jury should "take into consideration all of the evidence in the case, . . . all of the facts and circumstances proven in

the case." No other exception was taken to the charge under that question. Assuming for the present that the submission of the question was proper, then the instruction so given was certainly not improper. The jury's answer to that second question, in the affirmative, determined that the presence and condition of the set-screw rendered the place where the plaintiff was so working at the time not reasonably safe.

4. By the third question submitted to the jury they were called upon to determine whether the defendant was negligent in permitting said set-screw to be and remain on said machine as it was. After stating that the inquiry referred to in this question was as to the time of the plaintiff's injury, August 24, 1903, the court charged the jury at some length under that third question, each clause thereof being excepted to by counsel for the defendant. The portions of such charge relating to the statutory requirement are as follows:

"Whether the defendant company was negligent in the regard inquired of in this question depends upon whether or not the said set-screw was so located on the said slitter shaft as to be dangerous to employees while in the discharge of their duties. Our statute provides that the owner or manager of every place where persons are employed to perform labor shall securely guard or fence all shafting which is so located as to be dangerous to employees in the discharge of their duty. And if this set-screw in question was so located on the slitter shaft as to be dangerous to employees in the discharge of their duty, then, under the requirements of said statute, it was the duty of the defendant company to fence or in some way guard said set-screw on said shaft. The failure to guard or fence a set-screw on a shaft so located as to be dangerous to employees while in the discharge of their duty would be negligence. If the set-screw was not so located as to be dangerous to employees in the discharge of their duty, then there would be no occasion whatever for guarding or fencing it in any wise, and there could be no negligence in such case on the part of the defendant company in not guarding or fencing the set-screw in question."

These instructions speak for themselves, and made the question of the defendant's negligence in complying with the statute to depend upon whether the set-screw was so located as to be dangerous to employees, with instructions that if it was so located then the statute required it to be guarded and a failure to comply with the statute would be negligence, but if it was not so located then there was no occasion to guard or fence the same in any way. On the former appeal, and as a basis of argument, it was conceded "that the defendant was negligent in not guarding the set-screw in question," and there was no attempt to show an absence of such negligence. Counsel for the defendant now contend that the question whether the set-screw was so located as to be dangerous to employees was for the court and not for the jury. The statute referred to declares that "all belting, *shafting,* gearing, hoists, fly-wheels, elevators, and drums" in every place where person's are employed to perform labor, *"so located as to be dangerous* to employees in the discharge of their duty, shall be securely guarded or fenced" by "the owner or manager" thereof. Sec. 1636*j,* Stats. (1898). That statute, in substance, has been in force for twenty years. Ch. 549, Laws of 1887. It has frequently received consideration from this court. Of course, where there is no reason for conflicting inferences, the question is for the court. But there are numerous cases in this court in which it has been held that the question whether the unguarded shafting, gearing, or other appliance was so located as to be dangerous to employees was for the jury and not for the court. Thus it has been held that "whether the statute requires such machinery to be covered or guarded depends upon whether it is so located 'as to be dangerous to employees when engaged in their ordinary duties,'" and that that was a question of fact for the jury. *Guinard v. Knapp-Stout & Co. Co.* 95 Wis. 482, 485, 70 N. W. 671; *Kreider v. Wis. River P. & P. Co.* 110 Wis. 645, 656, 657, 86 N. W. 662. See, also, *Klatt v. N. C. Foster L. Co.* 97 Wis. 641, 646, 73 N. W. 565; *Thompson v. Edward*

*P. Allis Co.* 89 Wis. 523, 525, 528, 62 N. W. 527; *Thompson v. Johnston Bros. Co.* 86 Wis. 576, 582, 57 N. W. 298. In the case at bar the shaft, with the set-screw thereon projecting an inch and a quarter, as described in the foregoing statement, making 400 revolutions per minute, was only four and one-half feet above the floor on which the plaintiff's ordinary duties required her to work under that revolving shaft. We find no error in submitting to the jury the questions mentioned in the portions of the charge quoted.

5. Counsel for the defendant contend that the revolving shaft, with the set-screw thereon, is not included in the word "shafting," and hence was not required by the statute quoted to be "guarded or fenced," even if it was "so located as to be dangerous to employees in the discharge of their duty." The title of the original act above cited is: "An act to regulate factories, workshops and other places of employment." The head of the section is, in part: "Safeguards for Machinery," etc. The words employed in the section are general and not specific. The obvious purpose of the section is to require "the owner or manager of every place where persons are employed to perform labor," therein referred to, to protect such employees by properly safeguarding them against the action of any of the things therein named, when "so located as to be dangerous to employees in the discharge of their duty." Of course, the requirement of the section is not to be extended by construction beyond the meaning of the language employed. 2 Lewis's Suth. Stat. Const. (2d ed.) § 589. The general purpose of the statute, however, may be considered in construing such language. Id. § 590. It is there said:

"In statutes the sense signified is the law. The letter is but its servant or its vehicle." "Where the intent of the act is manifest, particular words may have an effect quite beyond their natural signification in aid of that intent."

The word *shafting* is defined by the Standard Dictionary:

"A system of stout rods or shafts, usually cylindrical, mounted in bearings, and serving to carry pulleys, gear

wheels, or the like, *for communicating power,* as from a
motor to machines. . . . *Flexible shafting*—a device made
up of advancing spiral wire coils, serving to *transmit rotary
motion* around corners, etc., to portable machinery."

The definitions given in the Century Dictionary are quite
similar, and define "shafting" as the system of shafts which
*connects machinery* with the prime mover, and through which
*motion* is communicated to the former by the latter." In the
case at bar the power or motion was communicated to the
slitters from the shaft to which they were attached by means
of set-screws. This court has inferentially, if not directly,
spoken on the subject. Thus it has been held:

"In an action by an employee for an injury alleged to have
been caused by the negligence of the employer in not covering
or guarding his machinery, the question whether" the statute
quoted "required it to be covered or guarded depends upon
whether it was 'so located as to be dangerous to employees
when engaged in their ordinary duties,' and that is a question
of fact for the jury." *Guinard v. Knapp-Stout & Co. Co.*
95 Wis. 482, 484, 485, 70 N. W. 671.

In that case the defendant requested the trial "court to in-
struct the jury that no statute law in this state required the
defendant to *cover or guard the set-screw* on which the plaint-
iff was caught," but the court refused to give such instruc-
tion, and this court held that such refusal was not error. In
that case the plaintiff "was oiling a rapidly revolving shaft
at the time of the injury, and his coat sleeve was caught in a
set-screw which projected from the collar upon the shaft,"
and he sustained serious injuries. There was no guard or
covering for the shaft or set-screws in that case. *S. C.* 90 Wis.
123, 125, 62 N. W. 625. In a later case it was held that the
question whether, under the statute quoted, "an employer is
negligent in failing to guard a set-screw on a paper winder
projecting nine sixteenths of an inch above the surface is for
the jury." *Kreider v. Wis. River P. & P. Co.* 110 Wis. 645,
648, 649, 656, 657, 86 N. W. 662. In that case a collar at the

end of the shaft was held in place and kept tight by means of a "set-screw with a square head, . . . with threads upon it, passing through the collar and against the shaft, which projected nine sixteenths of an inch above the surface of the collar." While the shaft was in motion the plaintiff's clothing was caught by the shaft and set-screw and he was badly injured. In the opinion of the court in that case it is said:

"We cannot hold as a matter of law that the defendant was not guilty of negligence by reason of such projecting set-screw being unguarded."

See, also, *Thompson v. Johnston Bros. Co.* 86 Wis. 576, 57 N. W. 298, where the location of the steel cord and check lines was such as to be dangerous to the operator of the elevator. We cannot hold as a matter of law that the defendant was not guilty of negligence by reason of such projecting set-screw being unguarded.

6. Nor do we perceive any error in permitting the jury to consider, in connection with other evidence in the case, the fact that some time prior to the injury a bar or girth, located about nine inches below the slitter shaft, at the place where the plaintiff afterwards was required to work, had been taken out, and the purpose of placing it there and the reasons for taking it out. It related to the conduct of the defendant prior to the injury in respect to the place where the injury occurred. It may have had some bearing upon the question of negligence submitted to the jury by the third question of the special verdict.

7. The substance of the answer of the jury to the fourth question submitted is set forth in the foregoing statement. It is quite lengthy and need not be here repeated. Counsel excepted to the portions of the charge in submitting that question to the jury to the effect that it is the duty of an employer to provide a safe place for his employees to work, and in doing this he is only required to exercise ordinary care and prudence—that is, such care and prudence as the great mass

of men ordinarily exercise under the same or similar circumstances; that in answering that question they were called upon to determine whether or not, from the facts and circumstances in evidence, a person of ordinary prudence and intelligence, circumstanced as the officers of the defendant were at the time, ought reasonably to have foreseen that to leave this set-screw in the condition which it was in, and located as it was, might probably cause personal injury of some kind to some employee while in the discharge of his or her duty. There is no good ground for objection to any portion of such charge. Certainly nothing inconsistent with the ruling of this court in the recent case upon which counsel seem to rely. *Howard v. Beldenville L. Co.* 129 Wis. 98, 114, 108 N. W. ·48. At this point in the charge the trial court amended the fourth question submitted to the jury by adding at the beginning thereof these words: "If you answer the foregoing question [3] 'Yes,' then answer this." We perceive no abuse of discretion in making such addition to the question. Besides, if it had any effect upon the jury, it would seem to have been favorable to the defendant, since they were told by such addition, in effect, that if they answered the third question in the negative then they need not answer the fourth question at all. No other portion of the lengthy charge under that fourth question is excepted to, and portions of it are quite favorable to the defendant.

8. On the former appeal it was held that the questions of the plaintiff's assumption of risk and contributory negligence were questions of fact to be determined by the jury. *Van de Bogart v. Marinette & M. P. Co.* 127 Wis. 104, 108, 110, 106 N. W. 805. This is referred to by counsel; and it is conceded that the evidence on the last trial was, upon most points, the same as on the first, but that in one particular it goes a little further by proof on the part of the defendant that some of the girls employed in the mill used a "cutter stick," a little plain stick like a rule, about eighteen inches

long. The purpose of such cutter stick, it is said, was primarily to use in laying off sheets of paper, but it was frequently used by the girls to reach up and knock down shavings when the machine was on rolls. It was furnished at their request by the men in the factory. There is evidence tending to prove that a little while after the plaintiff was so employed she was shown such cutter stick and told that when the shavings got up too high to knock them down with the cutter stick. This, apparently, was to save the fingers from being caught by the slitter. There does not appear to have been any requirement or general custom to so use the cutter stick to knock down the shavings. It is undisputed that the plaintiff had no cutter stick at the time she was injured. She was not injured by the slitter, but by her hair being caught by the set-screw as described. The plaintiff testified to the effect that at the time of the injury she knew nothing about the set-screw and had never been warned in any way in respect to the same. The set-screw was revolving 400 times a minute only four and one-half feet above the floor. We cannot say as a matter of law that the case should have been taken from the jury.

9. Exceptions are taken because, in charging the jury on the question of contributory negligence submitted to them by the fifth and sixth questions of the special verdict, they were told that "by ordinary care" on the part of the plaintiff was "meant such care as the great mass of girls of her age ordinarily exercise under the same or similar circumstances." They were also told that it was "the duty of an employee to use ordinary care—that is, such care as the great mass of persons ordinarily use under the same or similar circumstances—to discover, observe, and appreciate such dangers as attend the work they are employed to perform and to avoid all known dangers and such as may be known or ascertained by the exercise of ordinary care." They were also told that the plaintiff, "being a minor, would not be held to the same

degree of care as an adult, but was bound to exercise such care in this regard as the great mass of girls of her age would ordinarily exercise under the same or similar circumstances." Such instructions seem to be in harmony with the repeated rulings of this court. Thus, in *Collins v. Janesville,* 107 Wis. 440, 83 N. W. 695, it was said by my Brother WINSLOW that "the test is such care as would be exercised by ordinarily prudent and careful children, or the great mass of children of her age, under similar circumstances." *Warden v. Miller,* 112 Wis. 67, 72, 73, 87 N. W. 828. Nor do we perceive any error in requiring the jury to determine from the evidence whether or not the plaintiff, "by the exercise of such care and prudence as persons of her age ordinarily exercise under the same or similar circumstances, should have discovered such set-screw, and have understood such danger as was incident to the presence and location of said set-screw in the condition in which it was in." *Meyer v. Milwaukee E. R. & L. Co.* 116 Wis. 336, 340, 93 N. W. 6. The brief of counsel makes no attempt to sustain such exceptions to the charge by reason or the citation of authority, and we perceive no good reason why they should not be overruled.

10. The only other ground urged for reversal is that the damages are excessive. They are very large, but the injury sustained is very severe. It is enough to say that we do not feel authorized to disturb the verdict. We find no reversible error in the record.

*By the Court.*—The judgment of the circuit court is affirmed.